**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| **DONNA BARNES,** | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | **NO.  21-3647** |
| | : | |
| **GINA M. RAIMONDO, in her official** | : | |
| **Capacity as Secretary of Commerce,** | : | |
| *Defendant*. | : | |
| | : | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                     **November 28, 2023**

Plaintiff Donna Barnes ("Plaintiff"), proceeding <u>pro se</u>, has sued Defendant Gina Raimondo, in her official capacity as Secretary of Commerce, ("Defendant") for discrimination under both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act of 1990 ("ADA"). Plaintiff claims that her employer, the United States Census Bureau, (1) fired her because of her race; (2) failed to provide her accommodations for her medical condition(s); and (3) retaliated against her for exposing deficient performance by managers.

Defendant has moved for summary judgment on all claims. For the following reasons, Defendant's motion will be granted in its entirety.

## I.   STATEMENT OF FACTS

The following facts are derived from the evidence submitted by the parties. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiff. The following record is derived from

Defendant's Statement of Facts (ECF No. 16 ("MSJ"), Ex. A, Statement of Undisputed Material Facts ("SOF")), together with exhibits of record and supplemented with Plaintiff's Response to the SOF (ECF No. 17 ("Resp. to MSJ"), Ex. A ("Resp. to SOF")). The parties' factual disagreements are noted where relevant. The facts are otherwise uncontested as presented. [1]

## A. **The Parties**

Plaintiff, Donna Barnes, identifies as a white woman. (SOF at ¶ 6.) The United States Census Bureau hired Plaintiff to serve as a Lead Census Field Manager for the Philadelphia region for the 2020 census. (Id. at ¶ 3.) Plaintiff had previously been employed by the United States Census Bureau for the 2010 census. (Pl. Decl. at 1.) For the period between the two censuses, Plaintiff was self-employed as a "life and love coach." (Pl. Dep. at 13:11-16.)

Plaintiff's term of employment with Defendant began on May 28, 2019, and was not to exceed one year. (SOF at ¶ 4.) However, "with satisfactory performance and behavior," her employment had the potential to be extended through November 2020. (Id. at ¶ 5.)

During her time working for Defendant, Plaintiff reported directly to Daniel Davidson ("Davidson"), a white male. Davidson reported to John Heyliger ("Heyliger"), a black male. Heyliger reported to Tamika Mitchell ("Mitchell"), a black female. (Id. at ¶ 7.) To summarize the relevant chain of command:

---

[1]  If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits. If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute. I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

Tamika Mitchell, Area Census Regional Manager (black female)



John Heyliger, Area Manager (black male)



Daniel Davidson, Area Census Office Manager (white male)



Plaintiff, Lead Census Field Manager (white female)

Plaintiff was diagnosed with skin cancer on December 11, 2019 and had lesions on her face and body. (Pl. Decl. at 2.) She began treatment soon thereafter, which included taking oral and topical medications, some of which had negative side effects. (Id. at 2-3, 6.)

## B. **Factual Basis of Plaintiff's Allegations**

By all accounts, Plaintiff's tenure at the Census Bureau was contentious. Plaintiff alleges that she was wrongfully fired for being a "whistle blower" in exposing Mitchell's ineffectiveness as Regional Manager. (Resp. to MTD at 4, 6, 39; Pl. Decl. at 24.) She claims that over the course of her employment, Mitchell created a "paper trail to build a case" to support terminating her. (Pl. Decl. at 24, 27.) Plaintiff further contends that she was not given the option to resign in lieu of being fired, an option given to two black colleagues. (Compl. at 3.) Plaintiff's relevant factual allegations are as follows:

- Beginning in December 2019, Plaintiff's "diligence to execute her job" exposed Mitchell's "inability to effectively manage." (Resp. to SOF at ¶ 9.) Mitchell then "retaliate[ed] against [Plaintiff] and instruct[ed] other managers to 'develop' documentation" to support terminating Plaintiff. (Id.)

- On December 18, 2019, Mitchell asked Plaintiff about the lesions on her face. At that time, Plaintiff told Mitchell that she was being treated for skin cancer. On December 26, 2019 Plaintiff told Mitchell that she was going home early due to her illness. On

February 19, 2020, Plaintiff was late to a training and Mitchell "called [her] to ask if [she] was ok." (Pl. Decl. at 2.)

- On March 20, 2020, Plaintiff, after self-identifying as being at risk, began working from home due to the COVID-19 pandemic. By March 27, Plaintiff felt that Mitchell and Heyliger were retaliating against her. A coworker heard Heyliger go on a "tirade" in the office about managers who were not willing to work in person. (Id. at 43-44.)

- Plaintiff was "able to perform the essential functions of the job without a reasonable accommodation." (Id. at 2.) Although Plaintiff did not request a reasonable accommodation, she did request time off from work for doctors' appointments and sick days. Her time off requests were never denied and were approved by either Heyliger or Mitchell. (SOF at ¶ 36; Pl. Decl. at 2-3.)

- Plaintiff "witnessed Tamika [Mitchell] be less than kind to some white employees, and never witnessed her be less than kind to black employees." (Pl. Dep. at 56:8-10.)

- Plaintiff alleges that she was treated differently than her black female coworker, J.P. (Pl. Decl. at 10.) Mitchell disciplined Plaintiff for failing to follow the chain of command, however, J.P. was not reprimanded for doing so. On February 28, 2020 J.P. resigned. A.G., another Census employee, told Plaintiff that J.P. was asked to resign and "Mitchell allowed her to save her reputation by not firing her." (Id.) Plaintiff also alleges she was treated differently than T.W., a black male who also was a Census Field Manager, because he was allowed to resign instead of being fired. (Pl. Dep. at 83:5-15.)

- Another Census employee, A.G., told Plaintiff that Y.T. referred to Plaintiff as his "blonde friend." (Pl. Decl. at 18.)

- Plaintiff was "excellent at [her] job and got along well with [her] co-workers." (Resp. to SOF at ¶ 8.)

**C.  Defendant's Justifications for Plaintiff's Termination**

**1. December 13, 2019 Conference Call**

Plaintiff contends that her issues with Mitchell began during a December 13, 2019 conference call. During a discussion about hiring four new clerks, Mitchell responded to a question in a way that Plaintiff considered "rambling," "confus[ing]," and contradict[ory]." (SOF at ¶ 11; Resp. to SOF at ¶11.) Plaintiff replied in an admittedly "agitated" tone and said to Mitchell, "[w]ait, you just contradicted yourself. You said yes to hire the clerks, and then you said no. Which is it, yes, or no?" (SOF at ¶ 11; Pl. Decl. at 6.)

4

Later that day, Mitchell called Plaintiff to "ask[] for clarification about the hire of the four employees on the conference call." (Pl. Decl. at 7.) Plaintiff told Mitchell: "'You teach people how to treat you. What you have taught me is that you don't listen to me until I get upset.' [Mitchell] snapped, 'I did not teach you that!' [Plaintiff] said, 'With all due respect, yes you did.'" (Id.)

**2. January 3, 2020 Encounter with Y.T.**

On January 3, 2020, Plaintiff attended a training session led by Y.T., a regional technician. (SOF at ¶ 14.) Plaintiff believed that Y.T. was unprepared to lead the session. (Id. at ¶ 15, Resp. to SOF at ¶ 15.) Plaintiff and "at least four other managers" jumped in to answer audience questions when Y.T. did not know the answer. (Resp. to SOF at ¶ 15.) Y.T. "singled Plaintiff out for no reason, she verbally attacked Plaintiff for doing the exact same thing other managers were doing." (Id. at ¶ 16.) Plaintiff "admit[s] she was irritable and had little patience in dealing with two people who didn't know what they were talking about yet tried to exercise authority." (Id.)

Plaintiff then left the training. According to Plaintiff, her direct manager, Davidson, approached her "and agreed she was singled out for no reason" and acknowledged that he had answered audience questions too, but Y.T. did not take issue with him. (Id. at ¶ 17.) Davidson subsequently issued both Plaintiff and Y.T. a "documentation of conduct and/or performance problems," also known as a D-282, as a result of the interaction during the training session. The D-282 detailed that Plaintiff exhibited "insubordination" when she "had a personality conflict with Y.T," left the training, and refused to return despite repeated requests for her to rejoin. (Pl. Decl. at 56.) Davidson noted that Plaintiff previously had received counseling for having a "forceful personality" on conference calls. (Id.) He stated that despite Plaintiff being "a good

5

employee," she needed to respect authority and the chain of command. After receiving the D-282, Plaintiff wrote in the response line, "Only when respect is due!" (Id.)

Davidson stated in his declaration that Mitchell advised him that the D-282 was "too mild" based on the magnitude of the interaction between Plaintiff and Y.T. Accordingly, Davidson amended the D-282 to reflect that if Plaintiff exhibited a "lack of respect for authority" again, he must "recommend termination." (Davidson Decl. at 4.) Plaintiff contends that Davidson "was coerced" by Mitchell to amend the D-282 to include the possibility of future termination. (Resp. to SOF at ¶ 19.)

**3. February 25, 2020 Encounter with M.H.**

M.H. temporarily filled in for Davidson as office manager. On February 25, 2020, M.H. emailed Heyliger to report that he and Plaintiff had an argument, during which she "got very loud" and "waiv[ed] her hands." (SOF at ¶ 21; M.H. Email.) M.H. approached Plaintiff about a work-related task and Plaintiff "responded by shouting that she is not paid enough for all of the things we are asking her to do." (Def. M.H. Email.) M.H. considered Plaintiff's actions to be hostile and disrespectful, and accordingly, issued a D-282.

The same day, Heyliger met with Plaintiff and M.H. Heyliger claims that, during the meeting, Plaintiff was "combative" and displayed "threatening and insubordinate" body language. (Heyliger Mem.) Plaintiff told Heyliger that he was "dead" to her. (Heyliger Mem; Pl. Decl. at 22.) Due to Plaintiff's "escalating tone" throughout the meeting, Heyliger asked her to go home for the day. (Heyliger Mem.)

Plaintiff presents a differing account of the interaction. Plaintiff claims M.H. knew she was on a steroid medication for her cancer treatment and that it made her "edgy." (Pl. Decl. at 21.) She claims that due to stress from her health issues, she did not respond well to M.H. confronting her about a task that she felt was minor. (Id.)

Plaintiff considers Heyliger's account of the subsequent meeting to be "toxic slander" and claims that it was she who was "bullied" by M.H. and Heyliger. (Resp. to SOF at ¶ 22-24.) Plaintiff admits to "talk[ing] with [her] hands" in the meeting but did not point her finger at Heyliger or M.H. in a threatening manner. (Pl. Decl. at 22.) She claims that during the meeting she experienced a "full flight-or-fight" response, and her anxiety was so high that she does not remember the meeting clearly. (Pl. Decl. at 22.)

### 4. March 5, 2020 Conference Call

On March 5, 2020, Davidson and another manager, D.L., a white male, alerted Plaintiff that there would be a last-minute conference call. Plaintiff expressed that she was frustrated with their decision to hold a last-minute call and that doing so was "[a]nother sign of ineffective management." (Id. at 36.) Plaintiff claims that D.L. "loudly screamed" at her after making the comment. (Id.)

### 5. April 14, 2020 Conference Call

In light of the COVID-19 pandemic, in March 2020, some Census Bureau employees began teleworking. Plaintiff identified as having "asthma and breathing problems" and was permitted to telework. (SOF at ¶ 35, Resp. to SOF at ¶ 35.) In early April 2020, Census Bureau leadership sent an email asking who would be willing to return to in person work. Employees that "self-identified as high-risk" were not required to return to the office. (Id. at ¶ 32, Id. at ¶ 32.)

Plaintiff spoke to her team and "really everybody had said [they would] rather collect unemployment" than put their health at risk. (Pl. Dep. at 125:8-12.) On April 14, 2020, Plaintiff and other managers had a call to discuss the return-to-work plan. She relayed her team's hesitance about returning to the office, at which point, Mitchell "scream[ed]" at her and said she was not helping and was not following directives. (Id. at 125:14-19.) Mitchell claimed Plaintiff

"forcefully stat[ed] her position on the call causing confusion and frustration." (Mitchell Decl. at 7.)  The same day, Davidson emailed Mitchell and Heyliger recommending terminating Plaintiff. (Davidson Email at 1.) Mitchell and Heyliger agreed. On April 16, 2020, due to Plaintiff's "constant, disruptive behavior," Mitchell issued a formal counseling memo. (Mitchell Decl. at 7.)

### 6. April 22, 2020 Termination

In a letter dated April 22, 2020, Mitchell notified Plaintiff that her employment was being terminated due to persistent "inappropriate conduct." (Termination Mem. at 2.) Specifically, Mitchell explained that since January 2020, she had received complaints of Plaintiff subjecting her employees to a hostile work environment and verbal abuse, along with being disrespectful to those in the chain of management. (Id.) Despite several counseling sessions with management, written warnings, and D-282s, Plaintiff's conduct did not improve, and Mitchell terminated Plaintiff's employment as Lead Census Field Manager as of Friday, April 24, 2020. (Id.)

### D. Procedural History

Plaintiff filed a complaint with the Equal Employment Opportunity Commission on May 11, 2020, alleging discrimination based on disability, which she described as "[s]kin cancer, [s]tress [r]ash, [and] Covid-19 anxiety," and retaliation by her former manager, Tamika Mitchell, "for pointing out problems."[2] (Compl. at 2, 7, 18; EEOC Op. at 2.) On May 19, 2021, Administrative Judge Natasha Abel granted the Census Bureau's motion for summary judgment, and the EEOC subsequently issued a right to sue letter. (EEOC Op.; Compl. at 19.)

On August 14, 2021, Plaintiff, acting pro se, filed suit against Defendant, setting forth claims under Title VII and the ADA. Following discovery, Defendant moved for summary judgment on all claims.

---

[2]     At some point after filing an EEOC complaint but prior to the Census Bureau filing a motion for summary judgment, Plaintiff added a claim of discrimination based on race. (See EEOC Summary Judgment Decision at 4.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252. Unsubstantiated arguments made in briefs are not considered evidence

of asserted facts. <u>Versarge v. Twp. of Clinton</u>, 984 F.2d 1359, 1370 (3d Cir. 1993). Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 241 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Documents filed by <u>pro se</u> litigants are "to be liberally construed." <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007). When ruling on a motion where a litigant is proceeding <u>pro se</u>, I must "read[] the <u>pro se</u> party's papers liberally and interpret[] them to raise the strongest arguments suggested therein." <u>Watson v. Philadelphia Hous. Auth.</u>, 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009) (internal quotations and citations omitted). However, despite this liberal interpretation, "on a motion for summary judgment, a <u>pro se</u> plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." <u>Dawson v. Cook</u>, 238 F.Supp. 3d 712, 717 (E.D. Pa. 2017) (internal quotations and citations omitted). "The party opposing summary judgment, whether pro se or counseled, must present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial." <u>Watson</u>, 629 F. Supp. 2d at 485 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).

## III.   DISCUSSION

Plaintiff alleges three causes of action under Title VII and the ADA: (1) discrimination premised on her race/national origin; (2) discrimination premised on her disability and (3) retaliation for exposing bad management practices. Defendant moves for summary judgment on all three claims.

### A.   <u>Race Discrimination</u>

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's race discrimination claim relies on the same burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411, U.S. 792 (1973).[3]

To establish a claim of race discrimination under Title VII, a plaintiff-employee must first establish a prima facie case. Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); McDonnell Douglas Corp., 411 U.S. 792. To establish a prima facie case of race/national origin discrimination, a plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. Jones,198 F.3d at 410–11; Warfield v. SEPTA, 460 F. Appx 127, 129-30 (3d Cir. 2012).

If a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action suffered by the plaintiff. McDonnell Douglas Corp., 411 U.S. at 802. If defendant meets this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that any proffered justifications are pretextual and that the real reason for the employer's conduct was prohibited discrimination. Id. at 802-804.

Defendant argues that Plaintiff's race discrimination claim fails on two grounds. First, it contends that Plaintiff has failed to set forth any evidence in support of the fourth element of the prima facie case—circumstances giving rise to an inference of discrimination. Second, it claims

---

[3]    The McDonnell Douglas framework applies to claims brought under Title VII and the ADA. See Jones v. School Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999) (applying the McDonnell Douglas framework to a claim of race discrimination under Title VII).

that, even if a <u>prima facie</u> case exists, Plaintiff has failed to prove that Defendant's legitimate, nondiscriminatory reason for terminating her was mere pretext for discrimination. For the reasons that follow, I agree with Defendant.

    1.  <u>Circumstances Giving Rise to an Inference of Discrimination</u>

A factfinder may infer that discrimination was a proximate cause of an adverse employment outcome because either (a) similarly situated persons who are not members of the protected class were treated more favorably, or (b) the adverse employment outcome arose under circumstances that give rise to an inference of unlawful discrimination. <u>Warfield</u>, 460 F. Appx at 129-30. "Similarly situated" employees need not be "identically situated," but "must nevertheless be similar in all relevant respects." <u>Opsatnik v. Norfolk S. Corp.</u>, 335 F. App'x 220, 222-23 (3d Cir. 2009). <u>See also In re Trib. Media Co.</u>, 902 F.3d 384, 403 (3d Cir. 2018) ("To meet her burden of demonstrating that another employee is similarly situated, a plaintiff must show that there is someone who is directly comparable to her in all material respects.") (internal citation and quotations omitted). Which factors are relevant is a context-specific question, but the analysis often includes a demonstration that the two employees dealt with the same supervisor, were subject to the same standards, and engaged in the same type of conduct allegedly justifying the adverse outcome without such circumstances as might justify differential treatment. <u>Opsatnik</u>, 335 F. Appx at 223 (internal quotations and citation omitted).

The focus of the inquiry into allegedly unfavorable treatment is "on the particular criteria or qualifications identified by the employer as the reason for the adverse action." <u>Warfield</u>, 460 F. App'x. at 130 (relying on <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 646 (3d Cir. 1998)). I must, therefore, analyze whether a factfinder could infer that racial discrimination was the proximate cause of Plaintiff's termination because either: (a) similarly situated non-Caucasian employees

were treated preferentially or (b) Plaintiff's termination occurred under circumstances that give rise to an inference of discrimination.

To support a claim that non-white colleagues were treated preferentially, Plaintiff alleges that two of her black colleagues, J.P. and T.W., were given the option to resign instead of being terminated. Another Census employee, A.G., told Plaintiff that J.P. had shared with A.G. that she resigned, and that in doing so, Mitchell "allowed [J.P.] to save her reputation by not firing her." (Pl. Decl. at 10.) Similarly, Plaintiff stated in her deposition that she had "been told" that T.W. was asked to resign from the Census Bureau. (Pl. Dep. 83:9-11.)

Plaintiff's argument fails on several grounds. First, Plaintiff's repetition of statements from A.G. or other unnamed employees—which she offers for the truth of the matter asserted—constitutes hearsay. "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). Plaintiff's testimony about J.P. is double hearsay because it describes a statement that A.G. made to Plaintiff about a conversation that A.G. allegedly had with J.P. Thus, for the comment to be considered at the summary judgment stage, Plaintiff must demonstrate that both layers of hearsay would be admissible at trial. See FED. R. EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule ..."). Plaintiff has not submitted any sworn affidavits or deposition testimony from J.P. or T.W. that would allow the statements to be admissible at trial. Absent such evidence, I cannot consider the out-of-court statements for their truth.[4]

---

[4]     When considering a document filed by a pro se litigant, I must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247–48 (3d Cir. 1999). Although Plaintiff does not address potential exceptions to overcome the general prohibition on hearsay statements, in accordance with this requirement, I find that the statements do not fit into an exception.

Moreover, even assuming I could consider these statements at the summary judgment stage, J.P. and T.W. are not similarly situated comparators because neither was accused of insubordination or had a comparable disciplinary record to Plaintiff's. J.P. was an administrator in the human resources department who Plaintiff claims "was not good at her job." (Pl. Dep. at 56:21-57:3.) Plaintiff and J.P. both reported to Davidson, but when he was out of office, Plaintiff supervised J.P. (Pl. Dep. at 58:2-12). To Plaintiff's knowledge, J.P had no disciplinary history at the Census Bureau. (Pl. Dep. at 59:3.) Plaintiff claims that the only reason J.P. did not have a disciplinary history was because she and Mitchell were "budd[ies]" so J.P was never written up. Plaintiff's argument, however, is mere speculation and unsupported by any evidence from which a jury could find that J.P. had, in fact, engaged in conduct similar to Plaintiff. As to T.W., although he held the same position as Plaintiff and was asked to resign because he was "not effectively executing his job," Plaintiff admits that, to her knowledge, he had no relationship issues with management at the Census. (Pl. Dep. at 83:14-84:24.)

Finally, Plaintiff fails to identify any other facts in the record to support her contention that her termination arose under circumstances giving rise to an inference of discrimination. A factfinder may draw an inference of discrimination if the record suggests that an otherwise unexplained adverse action was more likely than not based on impermissible considerations. Pivirotto v. Innovative Sys., 191 F.3d 344, 352-53 (3d Cir. 1999); see also Equal Emp. Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990) (holding that under the fourth element, a plaintiff can satisfy his burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons."). But Plaintiff's evidence falls short. She points to her general "feeling that [Mitchell] was much friendlier to black employees than to white employees." (Pl. Dep. at 55:15-17.) The Third Circuit, however, has made clear that

"[s]peculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." <u>Paradoa v. Philadelphia Hous. Auth.</u>, 610 F. App'x 163 (3d Cir. 2015).  Moreover, Plaintiff points to a one-off comment by Y.T. to A.G. referring to Plaintiff as his "blonde friend." (Pl. Decl. at 18.) Y.T., however, was not a supervisor, let alone in Plaintiff's chain of management. It is well-established that "[w]here other evidence of discrimination is lacking, stray remarks by nondecision makers are too isolated to show independently that unlawful discrimination, rather that the defendant's asserted lawful reason, caused the adverse action." <u>Stone v. West River Group</u>, No. 18-cv-1640, 2022 WL 4472470, at *11 (M.D. Pa., 2022) (citing <u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 545 (3d Cir. 1992)).

As Plaintiff has failed to cite to any evidence of racial discrimination, other than her own speculative belief, a reasonable jury could not find that discrimination was a proximate cause of Plaintiff's termination.

  2.  <u>Pretext</u>

Even assuming Plaintiff was able to establish a <u>prima facie</u> case, her claim fails because she cannot rebut Defendant's proffered justifications for terminating her employment. To establish pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994).

Because Defendant has offered a "legitimate, nondiscriminatory" justification for Plaintiff's adverse employment action, that Plaintiff was "needlessly argumentative and

insubordinate," the burden shifts to Plaintiff to prove that a jury could find by a preponderance of the evidence that the proffered justifications are pretextual. (MSJ at 3); Jones, 198 F.3d at 410. To defeat Defendant's motion for summary judgment, Plaintiff must point to some evidence from which a factfinder could reasonably infer either that Defendant's justifications were false, or that discrimination was the true cause of her termination. Id. at 412-13. "A plaintiff may not establish pretext by simply showing that the employer's decision was wrong or mistaken." Robinson v. Matthews Int'l Corp., 368 F. App'x 301, 304 (3d Cir. 2010). Instead, she must show there is "a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons, which can be done by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that allow a reasonable factfinder to find the [employer's] reasons unworthy of credence." Brennan v. City of Philadelphia, 856 F. App'x 385, 386 (3d Cir. 2021) (internal citations and quotations omitted).

Plaintiff does not meet her burden in demonstrating pretext. First, Plaintiff does not dispute the fact that the events leading up to her termination occurred. She only disputes the level of hostility that Defendant alleges she exhibited towards her coworkers/managers during those events.  Second, as explained above, she cannot offer more than conclusory allegations that she was terminated because of her race. To support her claim, Plaintiff states that Mitchell had a vendetta against her, that Mitchell allowed two black employees to resign in lieu of being fired, and that another, non-management Census employee referred to Plaintiff as the "blonde" to another employee. These allegations do not demonstrate pretext. Other portions of the record— such as the numerous complaints about Plaintiff submitted by her coworkers and members of her management chain alleging that she was insubordinate and disrespectful—strengthen the legitimacy of Defendant's decision to terminate her. (Termination Mem. at 1.)

The disputes of fact to which Plaintiff points to are not material to her race discrimination claim. Plaintiff alleges Mitchell "develop[ed]" a false narrative to fire her. (Resp. to MSJ at 23.) But Plaintiff does not allege that the alleged false narrative was based on race. Instead, she contends that Mitchell was "threatened by [Plaintiff] and went out of her way to get rid" of her because Plaintiff was, by her own accord, an "exemplary employee" and Mitchell was an ineffective manager. (Resp. to MSJ at 4, 31.) Plaintiff fails to connect the dots between her race and Mitchell being threatened by Plaintiff's performance at work, and allegedly formulating a plan to fire her as a result. Instead, Plaintiff refutes Defendant's characterization of her behavior throughout her employment as being "argumentative and subordinate" and instead insists that she was "well-liked, positive, and compassionate." (Id. at 4.) This dispute is not material to a claim of race discrimination. Plaintiff cannot prove pretext by "simply showing that the employer's decision was wrong or mistaken," which is what she has attempted to do here. Robinson, 368 F. App'x at 304.

Plaintiff's allegations do not demonstrate pretext. Put simply, the record does not support any reasonable contention that Plaintiff was treated differently because of her race. Because Plaintiff has not made out a prima facie case of discrimination or pointed to any genuine dispute of material fact as to that claim, Plaintiff's race discrimination claim fails as a matter of law and Defendant's motion for summary judgment as to this claim will be granted.

### B. Disability Discrimination

The Americans with Disabilities Act (ADA) makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Because Defendant is a federal agency, the Rehabilitation Act of 1973 ("Rehabilitation Act") applies instead of the ADA. See 29 U.S.C. § 701 et seq. The analysis under both is substantially the same.[5]

To establish a prima facie case of discrimination under the Rehabilitation Act, an employee must demonstrate "(1) that he or she has a disability, (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Donahue v. Consol. Rail Corp., 224 F.3d 226, 229 (3d Cir. 2000) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir.1996)). In the context of a failure-to-accommodate claim, an employee must make prima facie showing that a "reasonable accommodation is possible." Donahue, 224 F.3d at 229.  If the employee meets her burden, then the employer bears the burden of proving "that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer." Id.

Plaintiff alleges she was discriminated against for choosing to work from home starting on March 20, 2020 out of fear for her health. By March 27, 2020,  Plaintiff felt that Mitchell and Heyliger were discriminating against her because a coworker told Plaintiff that he heard Heyliger

---

[5]      A prima facie claim of discrimination under the ADA requires a plaintiff to show she is "(1) disabled within the meaning of the ADA, (2) can perform essential functions of his job with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of her disability." Drummer v. Trustees of Univ. of Pennsylvania, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017) (citing Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000)). The Third Circuit Court of Appeals "interpret[s] the ADA and the Rehabilitation Act similarly." Cross v. Postmaster Gen. of United States, 696 F. App'x 92, 96 at n.11 (3d Cir. 2017) (citing Yeskey v. Pa. Dep't of Corr., 118 F.3d 168, 170 (3d Cir. 1997)).
      Plaintiff's disability discrimination claim relies on the same burden-shifting framework set forth in McDonnell Douglas Corp., 411, U.S. at 802-807. See Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 667-68 (3d Cir. 1999) ("The McDonnell Douglas Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA.").

go on a "tirade" in the office about managers who were not willing to work in person. (Pl. Decl. at 43-44.) This allegation is mere speculation and unsupported by any evidence from which a jury could find that Defendant terminated Plaintiff because of her asthma and/or cancer. Because Plaintiff cannot offer more than conclusory allegations that she was terminated because she worked from home during the beginning of the COVID-19 pandemic, Plaintiff has not met her burden in proving a prima facie case of disability discrimination.

As to failure-to-accommodate, Plaintiff, by her own admission, never requested or required a reasonable accommodation. (Resp. to SOF at ¶ 38.) Her requests for intermittent sick leave were never denied by her managers. She never asked her managers for an extended leave of absence, nor has she produced any medical records which recommended one. "The employer must know of both the disability and the employee's desire for accommodations for that disability." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999). Here, Plaintiff did not ask Defendant for any time off which was not approved. As such, her disability discrimination claim also fails under a failure-to-accommodate theory.

The evidence does not support any reasonable contention that Plaintiff was treated differently because of her disability. Because Plaintiff has not made out a prima facie case of disability discrimination or pointed to any genuine dispute of material fact as to that claim, Plaintiff's disability discrimination claim fails as a matter of law and Defendant's motion for summary judgment as to this claim will be granted.

### C. Retaliation

Title VII, the ADA, and the Rehabilitation Act bar employers from retaliating against employees who report instances of discrimination. To establish a prima facie case of retaliation, a plaintiff must put forth evidence that: "(1) she engaged in activity protected [by Title VII or the

ADA/Rehabilitation Act]; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995).

For purposes of a retaliation claim, a plaintiff has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination. Carvalho–Grevious v. Del. State Univ., 851 F.3d 249, 257–58 (3d Cir. 2017). A plaintiff must prove that the retaliatory animus had a "determinative effect" on the employer's decision to subject the employee to adverse employment action. Woodson v. Scott Paper Co., 109 F.3d 913, 932 (3d Cir. 1997).

"[C]omplain[ts] about unfair treatment in general and express[ions] [of] … dissatisfaction" that "do[] not specifically complain about … discrimination" are not protected. Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995); Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006). "In considering what activities constitute protected conduct, [the Third Circuit has] emphasize[d] that anti-discrimination employment statutes are not intended to establish general standards for conduct of employers in dealing with employees." Daniels v. School Dist. of Philadelphia, 776 F.3d 181, 195 (3d Cir. 2015).

Plaintiff claims she was retaliated against by Defendant for exposing Mitchell's deficient performance as a manager. She describes what she believes constitutes retaliation in various ways throughout her complaint and her exhibits. (E.g., Plaintiff "was retaliated against for exposing abusive practices" by Mitchell (Compl. at 3); Plaintiff was retaliated against by Mitchell "for pointing out problems" (Id. at 7); Plaintiff was "retaliated against for speaking up against the bad management practices [she] observed and tried to improve." (Pl. Decl. at 5.)) She further contends that she "engaged in protected activity continuously beginning in December 2019" because she was a member of a protected class. (Resp. to MSJ at 37.)

Plaintiff does not meet her burden in establishing a prima facie case of retaliation. She fails to put forth evidence that she engaged in a protected activity because although Barnes made numerous complaints about management and the way she was perceived by her managers, those complaints did not reference discrimination and thus did not "oppose[] any practice made unlawful" by federal discrimination laws. See 42 U.S.C. § 2000e-3(a).

Plaintiff fails to point to any complaints that she made regarding her race or disability. Even if she did, Plaintiff does not prove that there is a causal link between such a complaint and her termination. Because Plaintiff has not made out a prima facie case of retaliation or pointed to any genuine dispute of material fact as to that claim, her retaliation claim fails as a matter of law and Defendant's motion for summary judgment as to this claim will be granted.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff has not demonstrated that she was terminated because of her race or her disability. She also has not shown that Defendant's decision to terminate her was in retaliation for any race or disability-based complaints. Accordingly, Plaintiff's claims fail as a matter of law and I will grant summary judgment in favor of Defendant.[6]

An appropriate Order follows.

---

[6]    In her response to Defendant's MSJ, Plaintiff concludes her brief by stating, for the first time, that she "endured a hostile work environment." (Resp. to MSJ at 38.) This claim is not properly before me because Plaintiff failed to plead it in her complaint.